UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------x

| | |
|---|---|
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, as subrogee of Star of America Charters LLC, | **MEMORANDUM AND ORDER**<br>Case No. 14-CV-6481 (FB) (PK) |

Plaintiff,

-against-

GARPO MARINE SERVICES, INC.,

Defendant.

-----------------------------------------------------x

*Appearances:*

| *For Plaintiff:* | *For Defendant:* |
|---|---|
| EDWARD P. FLOOD, ESQ. | JAMES W. CARBIN, ESQ. |
| MARTIN R. WEST, ESQ. | PATRICK R. MCELDUFF, ESQ. |
| Lyons & Flood LLP | Duane Morris LLP |
| 55 Broadway, Suite 1501 | 1037 Raymond Boulevard, Suite 1800 |
| New York, NY 10006 | Newark, NJ 07102 |

**BLOCK, Senior District Judge:**

On the morning of October 29, 2012, the M/V Star of America ("Star"), a vessel owned by Star of America Charters LLC ("SOA"), was docked at a marina owned and operated by Garpo Marine Services, Inc. ("Garpo"). As a result of Hurricane Sandy, the vessel struck the dock. SOA's insurer, National Union Fire Insurance Company of Pittsburgh, PA ("National Union"), declared the vessel a total loss and indemnified its insured.

Standing in SOA's shoes, National Union sued Garpo, asserting claims for (1) breach of contract, (2) breach of bailment, (3) negligence, (4) breach of the warranty of workmanlike service, and (5) breach of warranty. Those claims were the subject of a bench trial held on February 13 and March 13, 20, and 27, 2017. Following are the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure Rule 52(a).

## I.  Liability

### A.  Findings of Fact

#### *1. The Marina*

Garpo's primary business is commercial ship repair. It is operated and partially owed by John Garner. Garpo's office manager, Eleanor Roma, handled general administrative matters, including scheduling repairs.

Garpo has operated a marina since at least 1992. The marina is located in the Tottenville neighborhood of Staten Island, on Arthur Kill, a tidal strait between the island and northern New Jersey.

In carrying out repairs, Garpo followed a set pattern. On a typical day, various vessels would moor at a 130-foot, floating concrete dock referred to as the "staging dock." There, each vessel would be hauled from the kill by a travel lift, a type of crane on wheels mounted on a pier, to dry land for storage or the performance of

2

repairs.  The marina also included a pontoon dock.  While the pontoon dock was intended for long-term docking, the staging dock was not.

Garpo installed the staging dock without consulting a naval architect or marine engineer as to the dock's design or capacity.  It was supported by a number of timber pilings Garner had scavenged from the Marine Parkway Bridge in Jamaica Bay.  The pilings were approximately fifteen years old when they were installed at the marina in 1997.  Moreover, once the pilings were installed, Garner never inspected them to check for deterioration.  By his own admission, he checked only to see if the dock noticeably sagged; since it did not, he never replaced any of the pilings.  By 2012, the pilings appeared aged and withered, but relatively stable.

## 2. *The Vessel*

SOA's principals, Dorit Zeevi-Farrington and Michael Farrington, operated the Star as a dinner cruise yacht.  Michael captained the vessel and tended to inspections, repair, and maintenance.  The Farringtons frequently took the Star to Garpo's marina for repairs.

## 3. *Events Leading Up to Hurricane Sandy*

On October 24, 2012, Michael noticed an issue with one of the Star's jet drives.  The vessel was also due for a Coast Guard inspection.  Michael asked Dorit to make arrangements with Garpo.

3

Dorit called Garpo's office at least three times the same day. During one such call, she spoke to Roma, who authorized the Farringtons to dock the vessel at the marina until it could be hauled onto dry land the following Monday, October 29. Dorit then arranged for the Coast Guard to inspect the vessel later that week while it was still at the marina.

Believing that there was an agreement that the Star would be out of the water by the next day, Michael piloted the vessel to the marina on Sunday, October 28. After securing the vessel to the staging dock with the assistance of two SOA employees, he left.

Over the weekend of October 27 and 28, Garpo had allowed customers to dock their vessels at the pontoon dock to weather the anticipated storm. By the morning of the 29th, the pontoon dock was filled to capacity, with between fifteen and eighteen commercial vessels moored there.

That morning, Dorit called Garpo to confirm that the Star would be hauled to dry land. She eventually reached Roma and Garner. Roma told her that the vessel would remain docked at the staging dock; Garner agreed. To allay Dorit's concerns, Garner stressed that steps would be taken to secure and protect the Star during the storm.

Despite this assurance, Garner only checked that the vessel's moorings were secure. He testified that the vessel was "locked up" and could not be moved until its

4

owners arrived, Tr. of Mar. 13, 2017, at 63, and that he "expected [Michael] to show up any minute," *id.* at 64. He clearly knew, however, that all bridges to Staten Island had already been closed. And although he knew that the other vessels at the marina had been tied to the more secure pontoon dock, there was no room for the Star once "the hurricane got close." *Id.* at 65. In Garner's words, "[a]fter say 10:00 in the morning . . . it was every man for himself." *Id.*

*4. The Storm*

Approximately nine hours later, Hurricane Sandy made landfall near Atlantic City, New Jersey, battering the coast with winds of eighty miles per hour. The storm caused the wooden pilings supporting the staging dock to break. Both the dock and the Star were pushed west.

By the early hours of October 30, the Star lay on top of sunken derelict barges at property adjacent to the marina. Garpo took no action to protect the vessel and made no attempt to contact the Farringtons, who learned of their ship's condition from a text message from a fuel oil supplier later that afternoon. Dorit placed a number of unanswered calls to Garpo.

At some point on the 30th, the Star rolled from its resting place and fell into the water on its port side. When Michael arrived at the marina, he found the vessel partially submerged and resting on the bottom of the kill. National Union inspected the vessel and, as noted, declared it a total loss.

5

## B. Conclusions of Law

### 1. *Maritime Jurisdiction*

Federal district courts have jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction." 28 U.S.C. § 1333(1). The claims here fall within that jurisdiction because "storing and maintaining a vessel at a marina on a navigable waterway is substantially related to traditional maritime activity." *Sisson v. Ruby*, 497 U.S. 358, 367 (1990).

"With admiralty jurisdiction comes the application of substantive admiralty law." *East River S.S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 864 (1986). "Absent a relevant statute, the general maritime law, as developed by the judiciary, applies." *Id.* "Drawn from state and federal sources, the general maritime law is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules." *Id.* at 864-65 (footnote omitted).

### 2. *Breach of Contract, Breach of Warranty and Negligence*

Under general maritime law, one who undertakes to repair a vessel is under a duty to act in a workmanlike manner. *See Ryan Stevedoring Co. v. Pan Atlantic S.S. Corp.*, 350 U.S. 124, 133-34 (1956). The duty is often described as an implied warranty, *see id.*, but it is coextensive with the tort duty under general maritime law "to avoid . . . negligence." *Norfolk Shipbuilding & Drydock Corp. v. Garris,* 532 U.S. 811, 813 (2001); *see Henry v. A/S Ocean,* 512 F.2d 401, 406 (2d

6

Cir. 1975) ("This warranty, which arises from the stevedore's contract to render services to the shipowner, requires the stevedore to perform its tasks in a competent and safe manner."). Whether conceived as a warranty or a tort duty, it applies to both the repairs themselves and the care of the vessel in the interim. *See Hartford Fire Ins. Co. v. Novocargo USA Inc.*, 257 F. Supp. 2d 665, 673 (S.D.N.Y. 2003) ("Global owes the cargo interests a duty of care which is breached by negligently allowing further damage to the cargo in its care").

The Court concludes that Garpo orally agreed to remove the Star from Arthur Kill in advance of the storm. Even if it had not, its undertaking to repair the vessel obligated it to act in a workmanlike, non-negligent manner. It further concludes that Garpo breached its agreement/warranty/duty by leaving the vessel moored to the staging dock and failing to do anything to safeguard it during the storm.

### 3. *Bailment*

Under general maritime law, a contract for the storage or repair of a vessel constitutes a bailment agreement. *See Snyder v. Four Winds Sailboat Centre, Ltd.*, 701 F.2d 251, 252 (2d Cir. 1983); *Hudson River Cruises, Inc. v. Bridgeport Drydock Corp.*, 892 F. Supp. 380, 385 (D. Conn. 1994). A bailment is "the delivery of goods by their owner to another for a specific purpose, and the acceptance of those goods by the other, with the express or implied promise that

the goods will be returned after the purpose of the delivery has been fulfilled." *Muller Boat Works, Inc. v. Unnamed 52' House Barge*, 464 F. Supp. 2d 127, 147 (E.D.N.Y. 2006) (quoting *Goudy & Stevens, Inc. v. Cable Marine, Inc.*, 924 F.2d 16, 18 (1st Cir. 1991)).

A bailee is liable for damage to the property resulting from its negligence. *Id.* A rebuttable presumption of negligence arises if the bailor proves the property was delivered in good condition and returned damaged. *See GTS Indus. S.A. v. S/S "Havtjeld"*, 68 F.3d 1531, 1537 (2d Cir. 1995). The bailee can rebut this presumption with evidence that the damage "was in no way attributable to his negligence, or that he exercised the requisite care in all that he did with respect to the bailed article." *Leather's Best, Inc. v. S.S. Mormaclynx,* 451 F.2d 800, 812 (2d Cir. 1971) (citation and internal quotation marks omitted) (quoting *Richmond Sand & Gravel Corp. v. Tidewater Const. Corp.*, 170 F.2d 392, 393-94 (4th Cir. 1948)).

Garpo's oral argument to repair the Star created a bailment when the vessel was delivered to the marina. Because it was delivered intact and returned damaged, the presumption of negligence arises. Garpo has not rebutted that presumption; to the contrary, as explained above, the evidence adduced at trial *confirms* that the Star was damaged as a result of Garpo's decision to do nothing.

8

*4. Act of God Defense*

Hurricane Sandy's role in the damage does not excuse Garpo's liability. "When evaluating defenses such as Act of God or Perils of the Sea, courts must assess whether weather conditions were foreseeable at the given time and location." *Lord & Taylor LLC v. Zim Integrated Shipping Servs., Ltd.*, 108 F. Supp. 3d 197, 214 (S.D.N.Y. 2015) (citing *Thyssen, Inc. v. S/S Eurounity*, 21 F.3d 533, 539 (2d Cir. 1994)). "In addition, an absence of negligence is key, and a defendant must demonstrate that no reasonable precautions were available to prevent the damage at issue." *Id.* (citing *Sidney Blumenthal & Co. v. Atl. Coast Line R. Co.*, 139 F.2d 288, 291 (2d Cir. 1943)). Based on the precautions taken with other vessels, the Court concludes that Sandy's arrival and likely impact were foreseeable far enough in advance to allow Garpo to take protective measures.

## II.  Damages

National Union's damages are measured by the Star's fair market value at the time of loss. *See Kanematsu-Gosho Ltd. v. M/T Messiniaki Aigli*, 814 F.2d 115, 118 (2d Cir. 1987). Garpo's expert estimated the vessel's value at somewhere between $700,000 to $800,000, while National Union's expert set it at $1,375,000 to $1,945,000.

The value proposed by National Union's expert has three flaws. First, his valuation was based on the advertised "asking" price of vessels selected from

random journals and a database that Garpo never had an opportunity to examine; he never sought to determine if the vessels listed were actually sold for the prices sought. Second, he relied on hypotheses which do not bear close scrutiny. For example, he assumed the Star could carry 149 passengers, yet current regulations limit its capacity to 108. He further assumed that the vessel suffered from no corrosion, even though that defect was admitted by the Farringtons and confirmed by the vessel's eventual buyer. Third, the Court finds unreasonable National Union's expert's assumption that the Star had seventeen more years of working life; even he previously initially projected only four more years of functionality.

By contrast, the Garpo's expert's opinion was supported by more credible evidence. This evidence includes the Star's purchase price of $1,000,000 in 2008 and more reliable actual sales prices of more comparable vessels, based on the aforementioned corrosion and other defects supported by the evidence. No estimate is perfect, of course, but Garpo's expert's methodology and assumptions were sound.

For these reasons, the Court finds that the Star's fair market value at the time of loss was $750,000.

### III. Conclusion

In accordance with the foregoing findings of fact and conclusions of law, a judgment of $750,000 will be entered in favor of National Union and against

10

Garpo.

**SO ORDERED.**

Frederic Block
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
September __19__, 2017